Please all rise. Hear ye, hear ye. This Honorable Appellate Court of the 2nd Judicial District is now back in session. The Honorable Susan F. Hutchinson is up. Please be seated. Your Honor, the final case on the docket this afternoon is 2-24-0620. The people of the State of Illinois, Interim Appellee G. Jessie v. Swift. Interim Appellate. We are going on behalf of the Appellate, Ms. Gloria Sierra. We are going on behalf of the Appellee, Ms. Victoria E. Lewis. Well, good afternoon. Has it gotten any warmer out? We've been in here since 9 o'clock. Still cold? It's a little warmer actually. Good. I was freezing. The wind. All right. So, is it Siri? Whenever you're ready, you may proceed.  Good afternoon. May it please the Court. My name is, again, Miriam Zierig. I'm out here on behalf of Jessie Swift. We're asking this Court to reverse the trial court's dismissal of Jessie's petition and order an evidentiary hearing on the issue of whether his de facto life sentence violates the Illinois Proportionate Penalties Clause. And the State here does not really contest a substantive claim. And by that I mean that a life sentence for somebody who was 18 at the time of the offense and has the kind of rehabilitation that he has demonstrated and the facts to show that rehabilitation actually violates the Proportionate Penalties Clause, but rather makes a forfeiture argument and says that claim should have been included in the 2003 petition. In addition, I really want to focus on both the cause and prejudice element here that is what really is in contest here. So I want to start with the State's argument that he has failed to show cause for including this claim in the petition in 2003. The argument here is that it's not the law, but the facts underlying the petition that were not available to him in 2003. And the facts that we're relying on fall really into three buckets. So there's, first of all, there's the new scientific evidence that underlies the petition that's You call it new. It's been around for a while. It's been... Since Miller. Right. Even before Miller, because Miller relied upon scientific studies that had been out there for decades. Well, I... I have a book about juvenile justice written in the 1950s that talks about the developing brain. So I would contest that the 1950s would have been a time where somebody could have... Somebody like Jesse in prison would have been able to make a colorable claim that the brain had that type of development. I think Dr. Gargarindo... When we're talking about the brain and development, in most of the studies, we're talking about impulse control and the lack of impulse control in decision-making, right? That is certainly... I think that what we're really talking about... Did the expert in this case read the trial record? Did I read the trial record? No, no, the expert that interviewed...  That interviewed... Dr. Gargarindo says that he did read, I believe... Yeah, I actually do think... I would have to check again, but I believe it's in his report that he says that he read the trial record. Did he talk about Swift's deceit and his manipulation and the lies that he told in his report? His report doesn't reflect anything about the deceit and dishonesty that Mr. Swift displayed throughout the proceedings. Throughout the proceedings at the trial? At the trial, he lied. He had his brother lie. He had his cousin lie. So... They all lied. Isn't deceit and dishonesty... Isn't it different than lack of impulse control? So, I think what we really want to focus on is not what happened in 1999 at the time of the trial, but what has happened since 1999, because at the time of the trial, Jesse was still 18, and I would argue that lying may even also be part of impulse control. And I think what the record really demonstrates here, that the Jesse, even the Jesse who was on trial... Honestly, even the Jesse who in 2003 was still wrangling with coming to terms with what he has done is not the Jesse who brings this claim now in, I think he filed in 2019, when he has done that introspection, and that is in Dr. Garbarino's report, that he has done the type of introspection that has allowed him to go back on what person he was and the person that he has become, and that is also in Dr. Garbarino's report. And again, and I think one thing I want to say, to the extent that there are things that are to be attacked in Dr. Garbarino's report, the state has not done that, and the second stage is not the time to do that, because at an evidentiary hearing, the state would have the opportunity to say, well, we contest what is in Dr. Garbarino's report, but we take at the second stage, Dr. Garbarino's report is true, and that has not happened in this case. How about people versus Moore? Do you want to discuss people versus Moore? I think to the extent that people versus Moore really does not talk about underlying facts. It really talks about the underlying law, whether Miller can serve as cause, and we are not... I will not agree with Moore, but I will say that we do not need Moore for this petition to advance to an evidentiary hearing, because cause is in the facts, and we know that going all the way back to Pitts and Barger. In Moore, the court said, Miller does not apply to young adults. It does not provide cause for a young adult offender to raise a claim under the proportionate penalties clause. But that's all in the same passage where we're discussing the law, Miller, not whether facts, and we're not relying on Miller, we're relying really on new facts. And the way that Miller comes in ultimately is if he gets a new sentencing hearing, and he can show that his brain was like that of a juvenile at the time that he committed the offense, then that sentencing court should take the Miller factors into account, because that would be the kind of showing that would be new, and that would be new evidence that was not considered by the sentencing court in 2000, when the sentencing actually occurred. Well, you indicated that if we look at the trial, then the 2003 post-conviction, and now this one, and he's had time to deal with or think about the issue, hopefully with a developed brain. But not that I'm disrespectful of your client, but the legislature said 18. They chose the age. They didn't say 18 and successive years thereafter. They said it's 18. That was it, under 18. And he was 18 and four months when this occurred. Correct. But what the Illinois Supreme Court has said in Harris is that if a person can be treated like somebody who was before 18, if he can show that he had the kind of developmental delays caused by extreme problems in the childhood that make him like a juvenile, and then we treat him for sentencing purposes like a juvenile, but the only way to do that is to actually show ultimately what goes into an ACE score, Adverse Childhood Experiences, which cause brain development delay. And then once we do that, we apply the same factors that would apply to a juvenile. So that is the way that somebody, not because the juvenile sentencing factors apply to somebody directly who is older than 18 and older, but when we can show that, and this is, I'm really just relying back on Harris to say, this is the avenue by which an emerging adult client can actually bring this before a new sentencing court. But the Supreme Court still hasn't pulled the trigger, so to speak, on over 18. They just said there might be some considerations. They haven't exonerated anyone, to the best of my knowledge, on over 18 under these circumstances. Right. But the Illinois Supreme Court has said that a sentencing hearing can occur. Well, it has really said, what it has said is exactly what is happening here, that he can bring a claim in a post-conviction petition and say, and bring forth evidence, which is exactly what occurred here, to show that he had Adverse Childhood Experiences, which made his brain more like that of a juvenile than an adult. And then if he makes that showing, that says he received a life sentence, which we know we should not, or which the Illinois Constitution forbids, for giving a life sentence to somebody who is under 18. That shocks the moral sense of the community. And so if we can make that showing, and he has made that showing here, in his petition, via this report from Dr. Garbarino, then we can have a sentencing hearing that would take that into account. But he's about, what, 40-something now? He's 46 now. Okay. So, I mean, we've done competency hearings. We've gone back years after, from the time of appeal or time of the trial to the time of appeal. How in the world could, we don't know what his brain looked like back in 1999. And that's critical to these circumstances. Right. And I'm not a scientist. I can say that the way that somebody like Dr. Garbarino does this is via this Adverse Childhood Experience scoring system. Right? They go, and he asks 10 questions, and then he ranks people, and somebody like Jesse gets a score of 8, which ultimately says, out of 1,000 kids, he had the worst childhood. I'm not really great at representing the statistics. But that's about what it says. Do we know if that test has been submitted for scientific acceptance? So this, the development of this test actually happened in the 90s. In Illinois, it did not really come, it wasn't used until about 2013, and then again in 2017, so that there's a pretty wide scientific consensus over the use of these 10 questions, 10 factors. I think Dr. Garbarino says that that is a widespread among brain research, and I think in this community of people who do this, that is a widely accepted test. Yes? Hold on just a second. The question was, has it ever been submitted for a FRI test or been accepted as an acceptable way to measure that which you purported measures? Yes or no? That, Your Honor, I don't know. But maybe that would be something to ask at an evidentiary hearing. That would be something that the state … But you need the results of the test in order to get to the evidentiary hearing. So is it chicken and egg or egg and chicken? I will admit that I have not thought about that, the question of whether a FRI hearing would be required for this. But I can tell you that it is widely accepted and that nobody has ever asked for a FRI hearing on this. So, yeah, I think that would be my best response from what we know from the showing in the petition with no argument from the state that this has not been subjected to scientific testing. What year was the trial? The trial was in 1999. The trial itself was in 1999? So I know that the sentencing hearing was in 2000, but I think it was in … So, like, on the border there … Well, it isn't sure. Yeah, I … Pre-trial. Yeah, I don't want to lie. Like, you know, I don't know the exact dates anymore, but so it occurred in 1999. It was tried in 2001. The sentencing hearing was in 2000. We do know that the state gave the defendant its best offer in 1999, right? And he turned down their offer. We don't know what the offer was, do we? I don't think so. I'm not aware. Probably more generous than what he got, right? Well, yes, yes. He has a de facto life sentence, so … But, again, we are talking about impulsivity, and, you know, somebody who is 18 … You think impulsivity is something that incorporates deceit and dishonesty? I … If these facts were presented to a trial court, and couldn't the court look at the defendant's behavior, manipulating people, lying to his own lawyer? His lawyer got up and said, my client didn't do this. He was at home. But we're not … He was never at the shell station that night. I don't really want to relitigate the facts. Well, don't be relitigating his thought processes and … That's what we did. emotionally. And at that time, he was in complete denial and involved in a … May I … And involved in a conspiracy to mislead the justice system. If I may just answer that question.  Of course. So, what we have in front of us is a report by a doctor who says, here were these adverse childhood experiences that produced this young man. And this young man is not the middle-aged man who's in front of us now. None of us are. Right. None of us are the person who … Right. And what the Illinois Constitution requires, the Illinois Constitution has a rehabilitation requirement. And it requires that when we sentence a young person to life in prison with no possibility of parole, we have to take into account that someone may have the ability to rehabilitate himself. And that is in this report that he has achieved that. That's new evidence that is in this report that he has done that and that wherever he was at 18, he no longer is. And to the extent that there's evidence to the contrary and evidentiary hearing can unearth more evidence as to that. But we cannot rely on evidence from 1999, which is, according to this report, outdated. But this new person that he has become happened in a controlled, a very controlled environment that may have forced it in some way. Who knows? But it's not like he's out in the community getting better, so to speak. So how do we deal with that issue? Well, I think there are two responses to that. Our justice system has designated prisons as the place where rehabilitation is to take place. So we have to have some kind of confidence in that that's happening. And then we have a report from Dr. Garbarino that says I have evaluated this individual and he's at the lowest, he's in the lowest danger of recidivism of anybody. So we have somebody who has looked at him. So I think those are two things that we have to have some faith in. I mean, we have to have some faith in our own rehabilitation system, the one that we've come up with. Just as, nope, Ann. Thank you. You'll have an opportunity to respond after Ms. Joseph finishes, if you wish. Thank you. You're welcome. Good afternoon, Your Honors. Victoria Joseph for the people of the state of Illinois. May it please the Court and counsel. We know that the legislature has told us that we disfavor successive post-conviction petitions. And we start with the presumption if you did not raise a claim in an initial post-conviction petition, it is waived. It is only relaxed in very small number of circumstances. One is actual innocence and one is when you raise cause of prejudice. Cause here is identifying an objective factor. This is quoting the statute. Identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings. Here, the specific claim that they're saying now, especially in the reply brief, that was not raised and could not have been raised earlier was a proportion of penalties claim. That could have been raised in the initial petition. Would it have been raised, if we go one step, based upon defendant's age or just generally the penalties issue? We know from controlling authority in the state that considerations of youth, raising it specifically to address youth, has been around at least since the 1890s, I believe, was the first time that was considered. So yes, the specific additional support to strengthen the claim since Miller has come since. That does not impede the ability to have raised the claim earlier. It just means there's additional support now that probably would make the claim better. And we know that our Supreme Court in Thompson has said raising an as-applied challenge, proportion of penalties challenge, would be permissible even for emerging adults, would be permissible, not necessarily found meritorious, if raised for mandatory life sentences in an initial petition. We have neither of the circumstances here. In the defendant's initial petition, did he confess, say that he actually was the killer? Oh, I do not remember, Your Honor. I don't think so. I don't think so. I believe that's come. So this is a new fact, his acknowledgment. His acknowledgment. There are apparently many new facts that he has changed his mind since 1999, 2000, 2003. Because the only way we're going to get to this, the brain and its development, is to now say it's a little like self-defense. Yeah, I did it, but I had to do it because I didn't have any other way. So now he is admitting that this occurred, but it's because his brain didn't know what to do, correct? That appears to be what his claim is, Your Honor. Again, at this stage, especially in the case of an adult offender, and we do have an adult offender here because Harris has drawn the line at 18. No case, I believe no case has carved back or forward, extended since that point. So he does have the responsibility to meet the pleading requirements of the act. And the people maintain that has not been met here. Controlling under Moore, Clark, Hillard, all of them have said the same thing, that these are not claims. You cannot rely on Miller to make these claims for an emerging adult, a discretionary life sentence, and especially in a successive petition where that does not provide cause. Again, the additional facts here are providing more support for a claim that could have been raised earlier. It is not a new claim. And again, insofar as the people maintain also did not show prejudice in that you had an emerging adult where youth was explicitly considered and was given a discretionary life sentence after considering the full factors of what the court called a cold-blooded assassination, the attempt to eliminate or at least intimidate other witnesses to that execution. So the court was balancing, did recognize even that he was for the most part obeying his probation until he committed this offense. So the court was recognizing those things about defendant, defense counsel brought up that he completed his GED. He had maintained work for a period of time but was not working at the time of the offense. But the court was considering everything on balance, and this was a very egregious offense that the discretionary life sentence was warranted. It was affirmed on direct appeal by this court. He did challenge his sentence as excessive at that point. And the only thing that was granted, the relief that was granted on direct appeal was the 1 Act 1 crime violation. So, and to answer your question, Your Honor, the trial started on August 28, 2000. And the offer was made and rejected, or at least indicated on the record on the 28th of May in 2000, or 1999. Are there any other questions Your Honors have? So my recollection that the trial judge at the sentencing hearing late 2000 actually did consider as one of the factors the defendant's age. Yes. He, I believe it was on record 1043. The court explicitly found his youth as a non-statutory factor in mitigation. Okay. Yes. And would it matter here if the defendant had been sentenced to the same number of years, but due to mandatory, obligatory add-ons because of the use of a weapon? Still not a juvenile, so still within the emerging adult, still cannot rely on the Miller progeny for that. To establish a claim. To establish a claim.  In full disclosure, this court has allowed the resentencing following an initial post-conviction as applied challenge to a mandatory life sentence for an emerging adult in Green Hosey that is currently in, accepted, the PLA has been accepted by the Supreme Court. Briefing, I think, is due early February from the appellant. That, again, in that case, the court advanced it, found the as-applied challenge. It was basically following the situation presented in Thompson where... Again, which case is it? That was Green Hosey from this court, I believe. Was that yours, Justice Jorgensen? So we recognize that done in the proper format of a post-conviction, initial post-conviction petition, it has advanced to that stage. It has been sent back for a new sentencing hearing, and I don't... The PLA is pending, so it obviously has not happened at that point. In this case, though, this was 2000. None of this, Miller hadn't happened. None of these things had happened. Nor was the sentencing court under any obligation to impose mandatory add-ons. So this was a purely discretionary sentence. Discretionary. The court considered the statutory factors in aggravation and mitigation, including the non-statutory juveniles, youth. We won't call it juvenile. But this was a discretionary sentence where the court weighed it all, was under no obligation to come up with 50 on a murder. No, the add-ons, while under the facts of the case, could have been alleged or not alleged. So they were not applied. They were not sought, as far as I know, from the state at any point. The only other thing I would bring up is Justice Burkett brought up the fact that this research has been around for a long time. Even within the case law, we know that Roper came out in 2005. That was before defendants amended initial petition was filed in 2009. So we were already seeing the emerging science happen within the justice system before that amended initial petition was filed. This is not necessarily related to the actual facts here. But it took about six years for this petition to, or one of the petitions, to come alive from 2003 to 2009. Is there anything in this record that indicates why it took so long? I couldn't find it, but I know it could be. I don't recall offhand. It's an awfully long time. Having been a part of the Griffin-Griffith case, I understand, Your Honor. Okay. Justice Burkett. The people ask the courts to affirm the judgment of the trial court. Thank you. Thank you. Ms. Zierig, if you have anything you wish to add, this is the time. Thank you. I think I want to address, because we haven't really talked about it in my opening, what happened at the sentencing hearing. Because while at the sentencing hearing in, I think, no, we said 2000, somewhere off 2000, there was one mention of use as a non-statutory factor in mitigation. What was not at that sentencing hearing was any mitigation, really, that was presented. And what was also in that was a bunch of things that actually were factually not correct. And this is part of our entire argument. Wait, wait, wait. You're trying to raise now things that were done wrong in a sentencing hearing nearly 25 years ago? No. What I'm saying is when we're looking at, you know, because the state's argument is that he's already had a review of his use at the sentencing hearing. And I'm pushing back on that. Because at the sentencing hearing, he did not have a review of his use. All the things that really would be relevant now, namely what made him more like a juvenile than an adult at that time. Because that's really what's at issue here. Was he a juvenile? And if he had been a juvenile, then the court would have not just said, your use is a non-statutory factor in mitigation. But then it would have said, oh, you were under 18. Here are all these things, your impetuosity, all these things that we know that we consider. But wait a minute. He would have been sentenced as a juvenile, not in adult court. Right. So that's what I'm saying. If he had been not 18, right, then the court would have considered all these factors that it did not consider because he was over 18. So they were not at issue at that sentencing hearing. And what we are saying is because he was more like a juvenile, the court should have considered the factors. And because it didn't, he should have a new sentencing hearing where they are considered. Okay. But even if it wasn't testified to or the judge didn't identify each one, which a judge does not have to do, he or she just has to identify sort of categories within that or point out aggravation or mitigation that appears, there was a pre-sentence hearing report that is much more detailed. And we have no allegation here that it wasn't relied upon or it wasn't read by the parties. No, in fact, what we are saying is the fact that that was relied upon is one of the big problems. Because what Dr. Garbarino has on earth, so Jesse was asked when this report was prepared, how was your childhood? And because he had no insight into what happened in his childhood, he said, I had a great childhood. My childhood was totally fine. What Dr. Garbarino uncovered by talking to Jesse is he had a horrible childhood. His parents were both using drugs. His father abandoned him. His mother told him to never respect authority. His father testified for him at trial. His father testified. His father testified? Yes, his father testified at trial. He didn't abandon him. His father said he was watching TV when Jesse came in. So that is, that may have been his, that may have been, I honestly don't remember. That's part of the trial record. But that, his father was in California. But maybe that was his stepfather? Maybe. So, but what we, so, and that stepfather, if he came to his aid, that stepfather had called him names, had pushed him, had been violent towards him. He'd grown up in a neighborhood where there was lots of gang activity, et cetera. That all we know now. But Jesse, when he was asked about that, had absolutely no insight into that. And what we know from Dr. Garbarino is that that's normal. Children don't know that they're growing up in a really bad environment because that's normal to them. And that's exactly what Jesse did here. He was asked, how was your childhood? He said it was fine. It wasn't fine. We know that. We have evidence of that now. How old was Jesse when he filed his first post-conviction petition? Twenty-three. Twenty-three. And he was still maintaining his innocence? Correct. Yeah. And Dr. Garbarino? He hadn't shown any growth in terms of acceptance of what he had done. It's interesting because that's also in Dr. Garbarino's report because Dr. Garbarino says at around 28, that's when he starts getting really understanding what he has done and what led him to do it. This case is kind of an example of why we use chronological age as opposed to the emotional age, right? Miller and what Moore says, that you can't use Miller to make a claim. Well, I think that's because you can't use Moore, I think. You can't use Miller, is what Moore says, because Miller, because the types of claims were already available before Miller, right? I mean, that's what Moore says. So what should we do? Should we put sentencing on ice until somebody is 28, when they kill people, and then sentence them when they're 28? Well, I think, for one thing, now we have the ability to do these evaluations because we have the science that did not exist then. And people do this now routinely. People bring in experts and say, yes. And the defendant can request relief from the governor. That is always an option. I'm not debating that as an option. I will say, since I represent people in front of the parole board, no parole decision has even been rolled out in years. I have many clients who have for years not even had their petitions looked at. But that's someone either here or there. No, but I'm being candid with you. If there is legitimate evidence that's presented to the parole board in the format that you were just discussing, you don't think there's any chance that it's ever going to happen? I wouldn't say there's no chance. I would never want to discourage my client. But what I'm saying is we have the Illinois, we can file a successive petition. He has that right to do that. And he has to show cause and prejudice. And he has done that. And that is an avenue. And we have the Illinois Constitution that has a rehabilitation requirement. And when you take all those things together, then he has made enough of a claim here to send us to an evidentiary hearing. Well, there has to be a determination. This is where the judge does have to say something, that within the information that's received, there does appear to be the ability to rehabilitate or something of that nature, or that they're rehabilitatable as opposed to just incorrigible. At the sentencing hearing or at the evidentiary hearing? No, at the sentencing hearing. Sure. Because there can be sentences over 45 years, which is the buffer, I think. Over 40 is the buffer age, yes. Okay. All right. Unless there are... No. Thank you for good arguments today. Thank you so much. Thank you, counsel. We will take this matter under advisement. We will now adjourn. And we will all go out and shovel snow if that's what's required.